# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| DANIEL K. TORRES, | CASE NO. 16-CV-00680-DKW-KJM |
| Plaintiff, | **ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' RENEWED MOTION FOR DISMISSAL AND SUMMARY JUDGMENT, AND (2) DENYING PLAINTIFF'S COUNTER MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| KIRSTJEN NIELSEN, TRANSPORTATION SECURITY ADMINISTRATION, *et al.*, | |
| Defendants. | |

## INTRODUCTION

Defendants, Kirstjen Nielsen (Nielsen), the Secretary of the Department of Homeland Security, and the Transportation Security Administration (TSA, and, together with Nielsen, "Defendants") move for dismissal and/or summary judgment on Plaintiff Daniel K. Torres' sole remaining count for retaliation under Title VII (Count One).[1]  Because the absence of a causal link between Torres' protected activity and his termination prevents Torres from establishing a prima facie case of retaliation, and because, even with a prima facie case, there is no evidence of pretext, Defendants are entitled to summary judgment on Count One.   In addition, because

---

[1]On October 11, 2018, the parties stipulated (Dkt. No. 59) to the dismissal of Counts Two and Three of the Complaint, the only other counts raised therein.

Torres has failed to explain why *he* is entitled to summary judgment with respect to any part of Count One, his counter motion for summary judgment is denied.

## BACKGROUND

The Court acknowledges that Defendants move for dismissal, pursuant to Fed.R.Civ.P. 12(b), and summary judgment, pursuant to Fed.R.Civ.P. 56, with respect to Torres' claim of retaliation. The question therefore is from what source the Court is meant to draw the factual background of this case: the Complaint, for purposes of Rule 12 dismissal, or the concise statements of fact and evidence filed in connection with summary judgment, for purposes of Rule 56. As discussed below, because Rule 12 dismissal of the retaliation claim is not appropriate, the Court draws the factual background from the parties' concise statements of fact and the accompanying evidence.

## I.    Factual Background

TSA hired Torres on October 12, 2002, as a Supervisory Transportation Security Officer (TSO) at Kona International Airport (Kona Airport) in Kailua Kona, Hawaii. Decl. of Gregory Knott ¶ 3(a), Dkt. No. 48-1; 10/12/02 Notification of Personnel Action, Dkt. No. 48-7.

In September 2009, Torres encouraged a co-worker, TSO Fumi Koizumi, to inform management of alleged sexual harassment by Assistant Federal Security Director (FSD) Wallace Sahara. 7/30/10 Individual Complaint of Employment

Discrimination at 4, Dkt. No. 48-16.   When Kona Airport FSD James Correa learned of Koizumi's allegations, he followed TSA policy by taking Sahara out of Koizumi's chain of command and referring the matter for investigation.   Decl. of James Correa ¶¶ 1, 3, Dkt. No. 48-3.   Torres submitted a statement to TSA's Management Inquiry Branch (MIB) on November 19, 2009.   Decl. of Sozit Mohamed ¶ 5, Dkt. No. 48-5; 11/19/09 Statement of Daniel K. Torres, Dkt. No. 48-10.   In March 2010, Transportation Security Manager (TSM) Nelson Dangtayan and TSM Evan Hokoana received letters of reprimand, arising from the MIB investigation into Koizumi's complaint.   Decl. of Robert Kawamoto ¶¶ 9-10, Dkt. No. 48-2.

In November 2009, Correa received a complaint from Behavioral Detection Officer (BDO) Kristy Lungo, alleging that Torres (who was also a BDO at the time) failed to disclose an intimate relationship with another BDO, made lewd and sexually explicit comments, and racially profiled passengers.   Correa Decl. ¶ 4. Following standard TSA procedures, Correa took Torres out of Lungo's chain of command and referred the matter to TSA's Office of Investigations (OI).   OI declined the investigation, sending it back to Kona Airport.   Correa then requested that Assistant FSD for Law Enforcement Dana Chong Tim handle the inquiry because Correa had worked with him before, and because Chong Tim was based in Honolulu, and not in the chain of command of anyone at Kona Airport.   Chong Tim

was appointed as the inquiry officer on November 13, 2009. *Id*. Chong Tim submitted a report to Correa on December 18, 2009, and the report was under legal review at the time Correa left the TSA on January 2, 2010. *Id*. at ¶¶ 1, 4. Correa did not take any disciplinary action or form any conclusions regarding the allegations against Torres before departing. *Id*. at ¶ 4.

After TSA's counsel reviewed the Chong Tim report, TSM Calvin Okahara and Chong Tim transmitted further written questions to various witnesses over the next few months. Kawamoto Decl. ¶ 4. Okahara also sent Torres a written list of specifications of possible wrongdoing and obtained Torres' written response. *Id*.

At some point between March and April 2010, Torres was accused of theft, resulting in assignment to a training room for 45 days without any responsibilities. 8/29/16 Testimony of Daniel K. Torres at 55:23-56:16, Dkt. No. 54-3.[2] After Torres complained to Stanford Miyamoto, the acting FSD at the time, Miyamoto had Torres restored to his duties. *Id*. at 57:9-25. No charges were filed as a result of this matter. *Id*. at 57:20-24.

On March 2, 2010, Torres made initial contact with an Equal Employment Opportunity (EEO) counselor, bringing allegations against Sahara and Okahara. Mohamed Decl. ¶ 6.

---

[2]When citing exhibits containing deposition transcripts, the Court cites to the page number of the transcript itself, rather than the page number assigned to the exhibit by the CM/ECF system.

On April 23, 2010, Assistant FSD Robert Kawamoto proposed Torres'
removal based on six specifications of unprofessional conduct and six specifications
of failure to follow agency policy. Kawamoto Decl. ¶ 5; 4/23/10 Notice of
Proposed Removal, Dkt. No. 48-13. The day before, during a telephone discussion
in which Kawamoto informed Torres of the proposed removal, Torres became quite
agitated and said something about "going upstairs to shoot the bastards" in an
apparent reference to TSA management. Kawamoto Decl. ¶ 6. Following TSA
policy, Kawamoto immediately referred the matter for investigation as a possible
threat of workplace violence, and, at the direction of Miyamoto, requested that
Torres' access to the airport be suspended. Chong Tim was assigned to investigate
this matter. In an interview on April 28, 2010, Kawamoto told Chong Kim that he
did not believe Torres intended to harm anyone. On April 29, 2010, Miyamoto
determined that Torres was not a threat, and Torres' airport access was restored. *Id*.

On April 25, 2010, Richard Wiles was appointed FSD at Kona Airport,
beginning work on May 7, 2010. Decl. of Richard Wiles ¶ 3, Dkt. No. 48-4. Wiles
became the deciding official with respect to the proposed removal of Torres. *Id*.
¶ 4. Torres and his appointed representative provided Wiles with oral and written
responses in June 2010. *Id*. ¶ 5. After taking into consideration all of the evidence
in the record, including Torres' responses, Wiles sustained 9 of the 12 specifications
for removal. *Id*. In issuing his decision, Wiles offered Torres a "Last

Chance/Abeyance Agreement" (LCA). *Id*. at ¶ 6. Torres was given the choice of

the LCA or being terminated. 10/20/10 EEO Counselor's Report at 3, Dkt.

No. 48-27.[3] Although Wiles believed that the charges against Torres were very

serious and completely justified his termination, Wiles offered him the LCA because

of the length of Torres' service and his willingness to take responsibility for his

actions. *Id*. at ¶ 7. Wiles was also new to Kona Airport, and he wanted to give

everyone the benefit of the doubt. Wiles gave LCAs to two other employees for

whom he had received proposed terminations. *Id*.

During discussion about the LCA, Wiles learned for the first time that Torres

had filed a prior Equal Employment Opportunity (EEO) complaint. *Id*.[4]

---

[3] In his concise statement of facts, Torres uses the quotation "sign or be fired" to explain what he was told when presented with the LCA. Torres' citations in this regard do not support such language. Torres cites his testimony at an Equal Employment Opportunity Commission (EEOC) hearing, but, in the pages to which Torres cites, the "sign or be fired" language comes from his counsel. 8/29/16 Transcript of Testimony Before the EEOC at 64:7-11, Dkt. No. 54-3. Torres also cites a deposition of Wiles. However, the page to which Torres cites is not included in the applicable exhibit. *See* Plaintiff's Concise Statement of Facts at 4, Dkt. No. 54 (citing 9/25/12 Depo. of Richard Wiles at 70:10-18, Dkt. No. 54-4); Wiles Depo., Dkt. No. 54-4 (containing, in non-consecutive order, pages 1-4, 21-32, 53-60, 77-92, 102, 17-21, 78, 94-96).

[4] Torres disputes that Wiles first became aware of Torres' prior EEO complaint during discussion about the LCA. *See* Plaintiff's Concise Statement of Facts at 4. The evidence to which Torres cites, however, simply does not back up his dispute. Torres cites the LCA itself. The LCA, though, generically references the withdrawal of any pending EEO complaint. 6/17/10 Last Chance/Abeyance Agreement ¶ 7, Dkt. No. 48-15. The LCA does not mention any specific EEO complaint plaintiff had filed, and therefore, it cannot be inferred the LCA gave Wiles notice of any such complaint. Torres next cites his affidavit. The affidavit, however, supports the notion that Wiles was *not* aware of Torres' EEO complaint prior to the LCA. In the affidavit, Torres states that he personally told Wiles that he had participated in Koizumi's EEO complaint. 12/27/11 Rebuttal Affidavit of Daniel Torres at 2, Dkt. No. 54-1 at 34. There are no dates for when Torres said this to Wiles, but, in light of the preceding discussion in the affidavit regarding the LCA (*see id*.), at best, Torres made the statements to Wiles during discussion of the LCA−precisely what Wiles contends. Torres finally cites a letter to Okahara that preceded Wiles' appointment.

Pursuant to the LCA, if Torres adhered to its terms for 12 months, the removal action against him would be rescinded. LCA ¶ 12. Torres agreed to conduct himself in a professional manner while in the workplace and follow all agency policies. *Id.* at ¶ 5. Torres also agreed to waive any appeal or grievance rights related to a removal action taken by TSA as a result of a violation of the LCA. *Id.* at ¶ 7. The LCA required Torres to withdraw any pending EEO complaint. *Id.* Torres acknowledged that the LCA meant that he was being given one more chance to prove that he could keep his job. *Id.* at 3. Torres signed the LCA on June 28, 2010. *Id.*

On June 30, 2010, Torres provided an Affidavit to an EEO investigator in connection with Koizumi's allegations of harassment. Mohamed Decl. ¶ 5; 6/30/10 Affidavit of Daniel Torres, Dkt. No. 48-12.

On July 30, 2010, Torres filed a formal complaint of employment discrimination, alleging wrongdoing against Sahara and Okahara. Mohamed Decl. ¶ 7; 7/30/10 Individual Complaint of Employment Discrimination, Dkt. No. 48-16.[5]

On November 22, 2010, TSA issued Torres a letter identifying the allegations

---

3/4/10 Letter to Calvin Okahara, Dkt. No. 54-1 at 42-43. How that letter informed Wiles of Torres' prior EEO complaint is unknown, but, in any event, there is no evidence that it did.

[5]The Court notes that, in his concise statement of facts, Torres describes this complaint as his "second EEOC complaint." Plaintiff's Concise Statement of Facts at 5. In his response in opposition to the motion for summary judgment, though, Torres discusses this complaint under a heading "First EEOC Complaint." Plaintiff's Opp. at 3-4, Dkt. No. 53. Based upon the Court's review of the evidence, the complaint Torres filed on July 30, 2010 appears to be *his* first complaint of employment discrimination. The Court, thus, considers it as such.

accepted for investigation as whether he was subjected to harassment on the basis of reprisal with respect to three separate matters. Mohamed Decl. ¶ 8. On December 13, 2010, TSA issued Torres' counsel a letter acknowledging Torres' withdrawal of his complaint. *Id.* ¶ 9.

On December 5, 2010, Torres was re-assigned to the position of Expert TSO-Security Training Instructor. Knott Decl. ¶ 3(b); 12/5/10 Notification of Personnel Action, Dkt. No. 48-8.

On March 17, 2011, Wiles learned that TSO Dalene Kamakea had reported Torres sexually harassed her while on duty at a checkpoint on March 16, 2011. Wiles Decl. ¶ 10. Wiles spoke with Kamakea about the incident within the next few days, and observed that she was quite upset about it. *Id.*[6] Wiles appointed Hokoana to conduct an administrative inquiry into Kamakea's allegations. *Id.* ¶ 11.[7] Dangtayan assisted Hokoana. *Id.*

_____

[6]Torres contends that Wiles spoke with Kamakea "days or weeks" after March 17, 2011. Plaintiff's Concise Statement of Facts at 5. That Wiles spoke to Kamakea "days" later is consistent with Wiles' assertion that he spoke with Kamakea a few days after March 17, 2011. As for the contention that the conversation occurred "weeks" later, Torres cites Wiles' deposition testimony. But that testimony shows only that Wiles could not at that time remember when he spoke to Kamakea, not that he spoke to her weeks later. 9/25/12 Testimony of Richard Wiles at 96:8-14, Dkt. No. 54-4.

[7]Torres contends that Kawamoto, rather than Wiles, appointed Hokoana. Plaintiff's Concise Statement of Facts at 5. That is simply not supported by the evidence to which Torres cites. In the cited evidence, Hokoana clearly answers "Correct" to a question about whether he was appointed by Wiles. 9/26/12 Testimony of Evan Hokoana at 25:10-12, Dkt. No. 54-12. Merely because Hokoana also testified that Kawamoto gave him the order to do the investigation, *id.* at 27:5-28:17, does not mean that Wiles did not appoint Hokoana. As Hokoana indicated in his testimony, this only meant that Kawamoto was passing on an order saying that Hokoana had been appointed by Wiles. *See id.* at 27:17-21.

On March 25, 2011, Hokoana provided Wiles with the administrative inquiry report, which included statements from Torres, Kamakea, Dangtayan, David Nakano, and Maureen Schwenk. 3/25/11 Informal Administrative Inquiry Report at 6, Dkt. No. 48-19.[8] Wiles shared this report with Kawamoto, who proposed reinstating Torres' removal action on March 28, 2011. Wiles Decl. ¶ 13. The proposed removal was based upon a specification of unprofessional conduct in that, while on duty on March 16, 2011, Torres said to Kamakea, "You touching your tits when you see me coming?" 3/28/11 Proposed Reinstatement of Removal Action at 1, Dkt. No. 48-20. The proposed removal was further based upon four specifications of failure to provide truthful information. *Id*. at 1-2.

On April 5, 2011, Torres and his lawyer presented oral and written responses to Wiles regarding the proposed removal action. 4/5/11 Response to the March 28, 2011 Proposed Reinstatement of Removal Action, Dkt. No. 48-21. Torres denied Kamakea's account of the March 16, 2011 incident, asserting that he said to her: "Why are you beating on your chest of breast." *Id*. at 7; Wiles Decl. ¶ 14. At around the same time, Wiles interviewed Kamakea herself, and heard her account of the March 16, 2011 incident. Wiles Decl. ¶ 15.

---

[8]Torres argues that Wiles had previously rejected Schwenk's statement. Plaintiff's Concise Statement of Facts at 6. That is not accurate. Instead, Wiles decided that he could not sustain a specification for removal against Torres based upon statements he purportedly made to Schwenk because the only witnesses to the statements were Schwenk and Torres, and Torres did not admit that he had made the statements. 6/17/10 Final Decision of Removal at 2, Dkt. No. 48-14.

In making a determination, Wiles relied on: (1) his review of the statements from all relevant witnesses; (2) his review of the materials Torres and his attorney submitted in response to the notice of proposed termination; (3) his interaction with Kamakea after the incident; (4) his interview of Kamakea; (5) his knowledge of Kamakea's character; (6) his interview with Torres; (7) Kamakea not having an apparent motive to lie, while Torres might have been motivated to lie to save his job; and (8) Torres engaging in similar misconduct in the past when he discussed at work an oral sex act that a TSO purportedly performed on him. *Id.* ¶ 16. Wiles reviewed Hokoana's report, but he did not rely on it in deciding what to do. *Id.*[9]

Based upon Wiles' review of the evidence, he determined that Kamakea's account of the March 16, 2011 incident was accurate and Torres' was not. *Id.* at ¶ 17. Wiles also found that Torres had not been candid with investigators about the incident, and had misrepresented a conversation he had with Kamakea on March 17, 2011. *Id.*; 4/29/11 Final Decision of Reinstatement of Removal Action at 1-2, Dkt. No. 48-22. Wiles further determined that a preponderance of the evidence supported finding that Torres had violated the LCA. Wiles Decl. ¶ 18. Wiles

_____

[9]Torres disputes that Wiles did not rely on Hokoana's report. Plaintiff's Concise Statement of Facts at 7. The arguments and/or evidence upon which he relies, though, do not support his dispute. Torres argues that Wiles had told others he intended to remove Torres. However, Torres cites to events *pre-dating* the LCA. *Id.* (citing an event purportedly occurring on May 21, 2010); 8/29/16 EEOC Testimony at 61:11-62:15, Dkt. No. 54-3. As for Torres' assertions that (1) Dangtayan and Hokoana were biased, (2) Wiles knew Dangtayan and Hokoana had been reprimanded in Koizumi's complaint, and (3) Wiles ignored violations of TSA policies during Dangtayan and Hokoana's investigation, none of these (even if true) mean or suggest that Wiles relied on the report.

found that any one of the five sustained violations of the LCA would have been sufficient to support reinstatement of Torres' removal. Final Decision of Reinstatement of Removal Action at 6.

On April 29, 2011, Wiles issued Torres a Notice of Final Decision of Removal (Reinstated). 4/29/11 Notice of Final Decision of Removal (Reinstated), Dkt. No. 48-23. At the time of Torres' removal, Wiles was aware that Torres had filed a prior EEO complaint. Wiles Decl. ¶ 7.[10]

Torres was terminated from his employment with TSA effective as of May 3, 2011. Knott Decl. ¶ 3(c); 5/3/11 Notification of Personnel Action, Dkt. No. 48-9. Torres made initial contact with TSA's EEO office on May 26, 2011 about his termination. Mohamed Decl. ¶ 10; 9/26/11 EEO Counselor's Report, Dkt. No. 48-24.

## II.   **Procedural Background**

On December 28, 2016, Torres filed a Complaint alleging three counts: (1) retaliation for protected activity in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*; (2) termination in violation of public policy; and (3) intentional and/or negligent infliction of emotional distress. Compl. at 11-13, Dkt. No. 1.

_____

[10]It is disputed whether, at the time of Torres' termination, Wiles was aware of Torres' involvement in the EEO complaint brought by Koizumi. Wiles asserts that he was not. Wiles Decl. ¶ 19. Torres asserts that, on several occasions, he informed Wiles that he participated in Koizumi's EEO complaint. Torres Rebuttal Affidavit at 2, Dkt. No. 54-1 at 34.

After Defendants moved for and then withdrew an initial request for dismissal and summary judgment, Defendants filed the instant renewed motion for dismissal and summary judgment on August 22, 2018.   Renewed Mot. for Dismissal & Summ. Judg., Dkt. No. 47.   Defendants moved for dismissal of Counts Two and Three on various grounds.   Subsequently, the parties stipulated to the dismissal of those counts.   Dkt. No. 59.   As a result, the only remaining count before the Court is Count One.

Defendants move for dismissal of Count One on the grounds that (1) Torres failed to allege timely contact with an EEO counselor, and (2) other than Torres' termination, all of the alleged conduct occurred more than 45 days before Torres contacted an EEO counselor.   Defendants also argue that, to the extent Torres may claim that he was subject to a hostile work environment, he did not allege any such claim in the Complaint, he did not administratively exhaust any such claim, and any such claim would not be viable.

In the alternative, Defendants move for summary judgment on Torres' retaliation claim.   Defendants argue that Torres has not established a prima facie case of retaliation, TSA had legitimate and non-retaliatory reasons for its actions, and Torres has failed to show that TSA's reasons for its actions were pretextual.

On September 28, 2018, Torres filed an opposition to the renewed motion for dismissal and summary judgment.   Opp., Dkt. No. 53.   Torres argues that TSA

engaged in a pattern and practice of retaliatory actions that created a hostile work environment. Torres also argues that there are genuine issues of material fact as to whether TSA retaliated against him for providing assistance to Koizumi. Torres further asserts that he should be granted summary judgment as to the LCA being coerced, void ab initio as contrary to public policy, and an illegal basis for his termination. In that regard, Torres filed a counter motion for summary judgment, challenging the validity of the LCA and the propriety of it serving as the basis of his termination. Counter Mot. for Summ. Judg., Dkt. No. 55.

## STANDARD OF REVIEW

## I.  Rule 12

Federal Rule of Civil Procedure 12 allows a defendant to move for dismissal of a claim on the grounds of, *inter alia*, lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(1), (6).

"Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways. A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quotation omitted). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id*.

"To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege enough facts to state a claim to relief that is plausible on its face." *Turner v. City & Cty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (quotation omitted). In assessing such a motion, "a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *Id*.

## II.  <u>Rule 56</u>

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim in the case on which the non-moving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In assessing a motion for summary judgment, all facts are construed in the light most favorable to the non-moving party. *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

## <u>DISCUSSION</u>

The Court will address the various issues presented in the parties' filings in the following order. First, Defendants' argument that Torres failed to allege timely initial contact with an EEO counselor. Second, Torres' counter motion for summary judgment. Third, Torres' argument that he was subjected to a hostile

work environment.   Finally, Defendants' request for summary judgment with respect to Count One, Torres' retaliation claim.

## I.   <u>Failure to Allege Timely Initial Contact</u>

As an initial matter, it is important to note that Defendants do not contend Torres failed to make timely initial contact with an EEO counselor with respect to his termination.   Nor could Defendants because, as they acknowledge, the evidence reflects that Torres contacted the TSA EEO office on May 26, 2011 −23 days after the effective date of his termination.   *See* Defendants' Memo. in Support at 14 n. 4, Dkt. No. 47-1;[11] *see also* 29 C.F.R. § 1614.105(a)(1) ("An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.").

Instead, Defendants argue that Torres did not allege what the evidence shows. More specifically, Defendants argue that Torres only alleged that he filed a complaint with the EEOC on August 12, 2011, which is more than 45 days after his termination.   That argument is certainly accurate.   *See* Compl. ¶ 26.   Nonetheless, it is not dispositive.   First, although the Complaint does not allege when Torres made initial contact with an EEO counselor, the allegations of the Complaint do not

---

[11]In citing to Defendants' memorandum of law in support of the renewed motion for dismissal and summary judgment, the Court cites the page number at the bottom of each page, rather than the page number assigned by the CM/ECF system at the top of the page.

foreclose that he did make such contact. As such, with respect to this issue, at best, the Complaint would be dismissed without prejudice, allowing Torres to amend the Complaint, which would then require the re-filing of dispositive motions. At this stage, the Court cannot imagine that is the path either party wants this proceeding to take. Second, the Ninth Circuit Court of Appeals has stated that "[w]hether a plaintiff in a Title VII action has timely exhausted her administrative remedies is an affirmative defense, so the defendant bears the burden of pleading and proving it." *Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch*, 572 F.3d 1039, 1046 n.7 (9th Cir. 2009). At worst (for Defendants), this suggests that Torres did not need to allege initial contact with an EEO counselor in his Complaint. At best, in light of Defendants' acknowledgment that Torres timely contacted an EEO counselor in relation to his termination, this is an affirmative defense Defendants cannot prove.

As a result, the Court denies the renewed motion to the extent that Defendants seek dismissal of Count One on the ground that Torres did not allege timely initial contact with an EEO counselor.[12]

---

[12]In the renewed motion, Defendants also seek dismissal of Count One, in part, because the count may pertain to various alleged actions aside from termination. Because those other alleged actions are addressed below in assessing whether Defendants are entitled to summary judgment on Count One, the Court does not address the same here.

## II.    Torres' Counter Motion for Summary Judgment

Torres moves for summary judgment on the following matter: "the document utilized to justify Torres' termination by [TSA] entitled, [the Last Chance Agreement or LCA,] was void <u>ab initio</u> as a matter of public policy, and there remain no issues of material fact regarding the legality of Torres' termination requiring a trial of this case."   Counter Mot. for Summ. Judg., Dkt. No. 55.

A party may move for summary judgment on any claim or defense or any part of a claim or defense.   Fed.R.Civ.P. 56(a).   Torres does not explain how his counter motion fits into this rubric.   Moreover, because Torres is represented by counsel, the Court need not liberally construe his arguments in order to find some purpose to the counter motion.   Nonetheless, even if the Court were to do so, the counter motion does not entitle Torres to any relief in this case.

In stating that a trial would not be required if the counter motion was granted, Torres appears to be moving for complete relief in this case.   In other words, summary judgment on all elements of Count One and any defense(s) Defendants have raised to the same.[13]   If that is the case, the counter motion is denied because, even if the LCA is as illegal as Torres contends it is, that alone would not prove his claim of retaliation or even establish a prima facie case of the same.   *See Ray v.*

---

[13]The Court notes that, to the extent Count Two−the only count in the Complaint mentioning public policy−can be construed as alleging that the LCA violates public policy, Torres has already stipulated to the dismissal of that count.

*Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (explaining that the burden of production only shifts to an employer if an employee makes out a prima facie case of retaliation).

More likely, Torres is seeking summary judgment as to a part or parts of Count One for which either he or Defendants have the burden of production. Although Torres does not identify any such part(s), it appears he is arguing that, because the LCA purportedly violates public policy, TSA should not have relied on it in terminating him. *See* Opp. at 21-22. Arguably, such an argument could relate to whether Defendants have articulated a legitimate, non-discriminatory reason for Torres' termination, but, at no point, does Torres make that argument. Instead, Torres skips that part of the analysis. *See id*. at 31-32.[14] Although the Court has liberally construed Torres' counseled arguments, even if he were pro se, it cannot make ones up for him. *See Pliler v. Ford*, 542 U.S. 225, 231 (2004).[15]

Therefore, because Torres has failed to explain why he is entitled to summary judgment as to any part of Count One, the counter motion is denied.

---

[14]Construing Torres' Opposition as it is written, it appears that Torres concedes the existence of a legitimate, non-discriminatory reason for his termination. *See* Opp. at 31 ("TSA posits a 'legitimate' non-retaliatory reason for Mr. Torres['] termination allegedly for professional misconduct in violation of the LCA.").

[15]In that regard, Torres has not pled a breach of contract claim or a claim for rescission of the LCA in this case. Therefore, although Defendants appear to raise a number of valid arguments in their reply as to why any such claim(s) would be barred here, the Court need not further address this matter.

### III. Hostile Work Environment

As described above, Torres has one remaining count in this case. That is Count One, which Torres refers to as "Retaliation for Protected Activity." Compl. at 11. In other words, Torres did not name Count One "hostile work environment" or any other collection of words that might imply the same. Nevertheless, in his opposition, Torres dedicates a great deal of time to arguing that a pattern and practice of retaliatory actions created a hostile work environment for him. *See* Opp. at 7-16. As a result, at the hearing on the parties' motions, Torres' counsel was asked where a hostile work environment claim is alleged in the Complaint. Torres' counsel pointed to Count One and the allegation thereunder that TSA's actions from October 2009 until his termination demonstrated a "pattern" of reprisal and retaliatory conduct. Compl. ¶ 30.

The initial question, therefore, is whether, by including the single word "pattern" to describe TSA's allegedly retaliatory conduct, Torres alleged a hostile work environment claim. This Court thinks not. Accepting (for the sake of argument) counsel's representations, Torres alleges that he was subjected to a hostile work environment due to retaliation. For such a claim to be actionable, Torres must have been harassed and such harassment must have been "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Ray*, 217 F.3d at 1245 (quotation omitted). In

addition, the harassment must have been "objectively and subjectively offensive." *Id*.

In the Complaint, Torres makes no allegation that he suffered harassment, let alone harassment that could be inferred as being sufficiently severe or pervasive to alter the conditions of his employment.   Most notably, there are no allegations that Torres was physically threatened or humiliated or that even one offensive utterance was directed toward him.   Even the concept of the "environment" in which Torres worked cannot be inferred from the Complaint.   Instead, as would be expected from a plaintiff alleging a *retaliation* claim, Torres alleges that he engaged in protected activity and TSA took actions against him for doing so.   Therefore, contrary to counsel's argument at the motion hearing, by merely alleging that TSA's acts were a "pattern" of reprisal, Torres did not allege a hostile work environment claim in the Complaint.   Moreover, this Court will not consider a new claim raised for the first time in opposing summary judgment.   *See Yonemoto v. Shinseki*, 3 F. Supp. 3d 827, 844 n.8 (D. Haw. 2014) (rejecting new allegations asserted for the first time in opposition to summary judgment).[16]

---

[16]The Court further notes that, neither at the motion hearing nor in his opposition, did Torres request leave to amend the Complaint in order to allege a hostile work environment claim.   At this stage in proceedings, any request would likely be untimely.   Further, so as not to encourage unnecessary briefing on the matter, the Court finds that any amendment to add a hostile work environment claim would be futile.   As Defendants argue in the renewed motion, Torres has failed to exhaust any such claim.   Renewed Mot. for Dismissal & Summ. Judg. at 17-18.   In response to this argument, Torres entirely fails to address whether he exhausted a hostile work environment claim.   Instead, Torres frames the issue as whether he "exhaust[ed] administrative

As such, in assessing Defendants' request for summary judgment below, the Court considers the sole claim alleged in Count One: retaliation.

## IV.    Defendants' Request for Summary Judgment

Title VII prohibits retaliation against an employee who has engaged in an activity protected by Title VII, such as filing an EEO complaint or participating in a Title VII proceeding.   42 U.S.C. § 2000e-3(a).   A three-step burden-shifting framework applies when considering summary judgment with respect to retaliation claims under Title VII.   *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).   Initially, an employee must make out a prima facie case of retaliation by showing "(1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action."   *Ray*, 217 F.3d at 1240.   If the employee succeeds, an employer must then present a legitimate non-discriminatory reason for the adverse employment action.   *Id.*   Finally, if the employer provides such a reason, the employee "must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext."   *Brooks*, 229 F.3d at 928.

---

remedies for the other acts cited as evidence of retaliatory intent."   Opp. at 27.   That, however, is irrelevant to whether Torres exhausted a hostile work environment claim.   In any event, Torres fails to explain how a hostile work environment claim could "reasonably be expected to grow out of" the charge of retaliation that he made before the EEOC, *id.* at 29, and, having reviewed the record, the Court cannot discern how.

## A. Torres' Prima Facie Case

In his Opposition, Torres asserts that he engaged in protected activity when he acted as a witness and provided assistance with respect to Koizumi's allegations of harassment.   Opp. at 16.   In the renewed motion, Defendants do not contest that this activity on Torres' part was protected under Title VII.   *See* Renewed Mot. for Dismissal & Summ. Judg. at 22.   Therefore, for purposes of summary judgment, the Court finds that Torres engaged in a protected activity when he acted as a witness and provided assistance with respect to Koizumi's allegations of harassment.   *See* 42 U.S.C. § 2000e-3(a).[17]

In his Opposition, Torres next asserts that he suffered a series of retaliatory and punitive actions that constitute adverse actions.   Opp. at 16.   Torres does not specifically identify the actions, instead citing to a number of actions listed in Defendants' renewed motion.   *Id*.   Torres also does not explain why any of the actions should be considered adverse for purposes of his prima facie case.   *Id*. Nonetheless, because the parties dedicate a substantial portion of their arguments to issues connected to what employment actions are relevant to Torres' only remaining claim, the Court will address those matters now.

---

[17]The Court notes that Torres' Opposition is far from a model of clarity, including with respect to the protected activity or activities upon which he is relying to establish his prima facie case.   For instance, it could be construed that Torres also relies upon an EEO complaint he filed in July 2010. *See* Opp. at 14.   After reading the totality of Torres' submissions, however, including where Torres reviews the elements of a prima facie case, and, for "protected activity," mentions only being a witness for and providing assistance to Koizumi (*id.* at 16), it is that activity the Court finds to be protected for purposes of evaluating Torres' prima facie case.

Initially, in light of the Court's earlier findings, it is undisputed that there is at least one adverse employment action that Torres may rely upon for his prima facie case: his May 3, 2011 termination. *See* Renewed Mot. for Dismissal & Summ. Judg. at 14 n.4, 22. There is much dispute, though, on whether Torres can rely on any other actions that occurred during his employment. Defendants argue that every other alleged employment action in the Complaint is time-barred because those actions occurred more than 45 days before Torres contacted an EEO counselor on May 26, 2011.

Defendants are undoubtedly correct that all of the listed actions took place more than 45 days before May 26, 2011. Forty-five days before that date is April 11, 2011. The latest of the listed actions took place on March 29, 2011. *Id.* at 16 (citing Compl. ¶ 24). Discovery has not altered the timing of the listed actions, at least not in the sense that the actions took place any time after March 29, 2011. As such, Torres cannot bring a retaliation claim based on any of the listed actions. *See* 29 C.F.R. § 1614.105(a); *Leorna v. U.S. Dep't of State*, 105 F.3d 548, 550-552 (9th Cir. 1997).

Nonetheless, Torres appears to contend otherwise, arguing that all of the listed actions were part of a pattern and practice of retaliatory actions that collectively created a hostile environment. Opp. at 7-9. Torres cites *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), in support. First, to the extent

Torres is attempting to argue that all of the listed actions add up to comprise a hostile work environment, for the reasons discussed above, Torres has not brought a hostile work environment claim in this case (nor has he administratively exhausted one).

Second, although Torres' failure to allege or exhaust a hostile work environment claim forecloses the manner in which he relies on *Morgan*, the Court addresses one further related argument that the parties raise.   In *Morgan*, the Supreme Court explained that whether a Title VII plaintiff has timely filed a charge with the EEOC depends on the nature of the alleged unlawful employment practice. *Morgan*, 536 U.S. at 110.   For a "discrete" retaliatory or discriminatory act, the act occurs on the day that it happened, and therefore, a charge must be timely filed from the date of the act.   *Id*.   In addition, each discrete act has a separate clock for filing a timely charge.   *Id*. at 113.   Hostile work environment claims, though, "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct."   *Id*. at 115.   Therefore, provided that one of the acts contributing to the hostile work environment claim occurs within the appropriate filing period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."   *Id*. at 117.

The Court focuses upon the matter on which Torres principally relies in his Opposition: the LCA.[18]  At various points throughout his Opposition, Torres argues, *inter alia*, that the LCA was coerced, the LCA was the basis for his termination, the LCA required withdrawal of his first EEO complaint, the LCA creates a causal link for purposes of his prima facie case, the LCA was void ab initio, and the LCA was contrary to public policy.  Torres also argues that the LCA was not a "discrete" act because when he signed it, he had not been terminated, he received the same salary, and he stayed on the same pay grade.  Opp. at 27.  Torres ignores, however, the reasons he repeatedly contends the LCA was unlawful – because he was coerced into signing it, it required him to withdraw an EEO complaint, and it required waiver of any future complaint related to his removal. Assuming those alleged problems with the LCA were retaliatory, as Torres contends, a discrete retaliatory act occurred on the day Torres signed the LCA.  *See Empire Bank v. Dumond*, 2013 WL 6238605, at *3 (N.D. Okla. Dec. 3, 2013) (finding "the signing of [an] extension agreement was a discrete act," and, thus, insufficient to revive time-barred claims under the Equal Credit Opportunity Act).[19]

---

[18]There are other actions listed in the renewed motion.  Whether or not they can be considered discrete acts, the Court chooses to spend little further time discussing them because, if they are discrete acts, they are untimely, and, if they are not, for the reasons discussed above, they provide no inference that Torres was subjected to a hostile work environment.

[19]Torres also argues that the LCA is a "contract of adhesion" and no TSA regulation permits the use of LCAs in disciplinary proceedings.  Opp. at 21-22.  Putting aside whether those assertions are accurate, they do not change the fact that a discrete act occurred on the day Torres signed the LCA.

In other words, if Torres truly was coerced into signing the LCA, after he signed it, he did not have to wait another moment before contacting an EEO counselor. *See Morgan*, 536 U.S. at 110 (explaining that discrete acts occur on the day that they happen).[20]

Because the LCA was a discrete act, Torres cannot use it as a component act of a hostile work environment claim even if he had raised such a claim. *See id.* at 114 (explaining that each discrete act constitutes a separate actionable claim). More importantly, given that Torres did not allege a hostile work environment claim, because Torres signed the LCA more than 45 days before he had contact with an EEO counselor, the LCA also cannot be a basis for a retaliation claim. *See id.* at 113 (explaining that each discrete act "starts a new clock for filing charges alleging that act."); 29 C.F.R. § 1614.105(a).

Nonetheless, despite Torres' unsuccessful efforts to manufacture a hostile work environment claim or otherwise establish the timeliness of the many other acts he alleges took place, the Court can still consider those acts. *Morgan* is clear in that regard. Even untimely acts can be used as "background evidence in support of a

---

[20]To the extent it is relevant, the LCA was also an adverse employment action. *See Morgan*, 536 U.S. at 114 (explaining that "each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). For example, if an employee is required to waive any EEO claims he may bring in the event of his termination, it is reasonably likely that the employee would be deterred from pursuing those claims. *See Ray*, 217 F.3d at 1243 (holding "that an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity"). So it is clear, though, the LCA is not an adverse action *for purposes of this case* because Torres did not timely contact an EEO counselor regarding it.

timely claim." *Morgan*, 536 U.S. at 113. Although Torres makes no mention of this seemingly important point, the Court will consider the untimely acts upon which Torres relies as background evidence in support of his timely retaliation claim. For now, it is enough to find that the only timely adverse employment action upon which Torres can bring a retaliation claim is his termination.

In the third part of his prima facie case, Torres must show a causal link between his protected activity and the adverse employment action. Here, that means that Torres must show a causal link between (1) him having acted as a witness and participated in Koizumi's harassment complaint, and (2) his termination.

Often, temporal proximity is used as the crux for establishing a causal link. That is because, "in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). Timing alone, though, is sufficient only if the adverse action occurred "fairly soon" after the protected activity. *Id.* (quotation and internal quotation omitted). The Ninth Circuit has stated that "three to eight months" may be a time range supporting an inference of retaliation. *See Flores v. City of Westminster*, 873 F.3d 739, 750 (9th Cir. 2017) (quotation omitted) (concluding that a jury could infer causation from a five-month gap).

Here, the evidence shows that Torres' last activity participating in Koizumi's complaint of harassment occurred on June 30, 2010, when he submitted an Affidavit to an EEO investigator.[21] The evidence further shows that Torres was informed of his termination on April 29, 2011. This is a gap of ten months. The Court does not find that a ten-month gap alone is sufficiently "fairly soon" to establish a causal link. *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) (involving a 3-day gap, and summarizing cases with sufficient temporal proximity of 59 days and more than 2 months). Indeed, Torres does not argue otherwise. Instead, Torres relies on other evidence that he contends establishes a causal link. This he may do. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005) (explaining that, "[a]lthough a lack of temporal proximity may make it more difficult to show causation," an employee can rely on other circumstantial evidence to establish causation).

Torres argues that there is a causal link here because the LCA conditioned his continued employment on him dropping an EEO complaint, and TSA relied on the

---

[21]Defendants assert that Torres acted as a witness in November 2009 in connection with Koizumi's allegations. Renewed Mot. for Dismissal & Summ. Judg. at 23. While that is true, Defendants ignore the fact that Torres' participation in Koizumi's case did not end at that time. The Mohamed Declaration, which Defendants submitted, clearly states that Torres provided an Affidavit in connection with Koizumi's allegations on June 30, 2010, and Defendants provide no reason why that act should not be considered protected activity. That being said, Defendants' focus on Torres' November 2009 statement is not unexplainable, given that, as discussed more below, Torres relies on events pre-dating the June 30, 2010 Affidavit in arguing that he has established a causal link. *See* Opp. at 16-20. In any event, solely for purposes of determining whether timing alone can establish a causal link, the Court uses the June 30, 2010 Affidavit as the protected activity closest temporally to Torres' termination.

LCA in terminating him.   Opp. at 16-18.   There are numerous problems with this argument.   Notably, despite Torres' apparent belief otherwise, the LCA is not an adverse employment action for purposes of this case.   In addition, as noted above, Torres did not assert that the EEO complaint was a protected activity for purposes of his prima facie case.   Essentially, therefore, it appears that Torres is attempting to argue that, because a causal link exists between two events that occurred during his employment and one of those events (the LCA) was relied upon in terminating him, there is a causal link between his termination and a third event (participating in Koizumi's case).   That is not how the causation inquiry works.   *See Ray*, 217 F.3d at 1240 (explaining that the link must be between the adverse employment action and the protected activity).

In any event, even if the Court were willing to liberally construe Torres' counseled arguments, and assume that Torres meant to also assert his EEO complaint as a protected activity, he must still show some causal link between his EEO complaint and his termination.   Again construing Torres' arguments liberally, it appears he argues that the two are linked because his termination was based on his purported violations of the LCA and the LCA was conditioned on him withdrawing the EEO complaint.   *See* Opp. at 17-18.   To the extent that is Torres' argument, it provides no explanation for why his EEO complaint and termination are linked.   Arguably, there is a link between the EEO complaint and the LCA, given that the

latter required Torres to withdraw any pending EEO complaint. But, given that Torres withdrew the EEO complaint, it has no bearing on whether Torres' subsequent termination was also linked to his EEO complaint. Moreover, there is no evidence in the record suggesting otherwise.

Torres suggests, however, that there is. Torres argues that Wiles knew of his EEO complaint. It is undisputed that, at the time of Torres' termination, Wiles knew of Torres' EEO complaint. While knowledge is "[e]ssential to a causal link," *Cohen v. Fred Mayer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982), it alone does not create a causal link, especially where, as here, there is insufficient temporal proximity, *see Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) (explaining that a causal link can be inferred from an employer's knowledge and temporal proximity).[22]

Torres' next argument, in contrast, assumes Wiles lacked knowledge of his EEO complaint. Given that Wiles knew of the complaint when he terminated Torres, the relevance of this argument is unclear. In any event, Torres appears to argue that Kawamoto "set[] in motion" a proceeding that led to his termination and "it is a question of fact" whether Kawamoto did this to retaliate against Torres. *See* Opp. at 18-20. Putting aside that there is no evidence supporting the contention that

---

[22]The Court notes that the insufficiency of temporal proximity is even more pronounced with respect to Torres' EEO complaint, given that Torres initiated it on March 2, 2010—over a year before his termination.

Kawamoto set in motion any of the matters Torres contends he did, the premise of the argument—that Kawamoto may have retaliated against Torres—is not supported by any evidence in the record. Notably, Torres does not actually assert that Kawamoto was biased against him. Instead, Torres asserts that Kawamoto was a "subject" of Torres' EEO complaint, which, presumably, suggests Kawamoto's retaliatory motive. The evidence, though, does not support Torres' characterization of his EEO complaint. Instead, the evidence shows that Kawamoto was *mentioned* in the EEO complaint; that is all.[23] Torres also asserts that Kawamoto drafted the

---

[23]Specifically, Kawamoto is mentioned as follows in Torres' EEO complaint:

> 4/22/2010 Phone conversation between Torres and AFSD Bob Kawamoto. Torres was explaining to Kawamoto that the VA Counselor was concerned that Torres was under a lot of stress. The counselor wanted to meet with Torres every week just to chat, until the investigation was completed. As the counselor put it, 'we don't want you to snap and start blowing peoples heads off.' Torres was explaining to Kawamoto that he (Torres) was in a situation because on the one hand, Torres wanted to meet with the VA counselor, but Torres did not want to be placed on leave restriction. Kawamoto advised Torres to not be concerned with the leave restriction. The conversation ended at approximately 4:30 PM.

7/30/10 Individual Complaint of Employment Discrimination at 6, Dkt. No. 48-16. Kawamoto is mentioned one further time in Torres' EEO complaint:

> 4/23/10 Torres' airport ID was de-activated and TSM Okahara advised TSA personnel not to allow Torres to enter the Administration building. The TSA personnel were instructed to contact the airport police. Torres was later advised by Airport Police Officer Joe Cava that[,] during the shift change briefing, Torres' picture was circulated and officers were instructed to arrest Torres if he was in TSA uniform on airport property. Torres was also placed on the Airport Stop list and TSA officers were to call Law Enforcement if Torres was seen on property. Okahara maliciously initiated the above actions after Kawamoto advised Okahara of the phone conversation he had with Torres the previous day. Torres only found out due to an e-mail that Torres received by accident.

*Id.* at 6-7.

LCA.   It is unexplained how this is relevant to showing Kawamoto's retaliatory motive.   Torres also cites no evidence for the contention that Kawamoto drafted the LCA.

Torres next argues that numerous violations of TSA policies during the investigation of Kamakea's allegations suggest the investigation was biased due to Hokoana and Dangtayan's participation.   Opp. at 20.   As an initial matter, Torres' argument that Hokoana and Dangtayan were biased stems from Torres' participation in Koizumi's allegations of harassment, not from Torres' EEO complaint, because Torres argues that Hokoana and Dangtayan were reprimanded in connection with Koizumi's allegations.   With that in mind, given that the evidence shows that Hokoana and Dangtayan received reprimands arising out of Koizumi's allegations, arguably, it could be inferred that they harbored a bias against Torres who participated in support of Koizumi.

Even if that assumption is made, however, it is less than half the battle because Hokoana and Dangtayan did not terminate Torres.   Wiles did.   Therefore, for Hokoana and Dangtayan's potential bias to have any import, they must not only have influenced or been involved in the decision to terminate Torres, they must also have set in motion the proceeding leading to the termination.   *See Poland v.*

*Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007).[24]   At the very least, Torres fails in the latter respect.

Notably, although Torres acknowledges that a biased subordinate must set in motion a proceeding, Opp. at 18, he makes no argument that Hokoana and/or Dangtayan set in motion the Kamakea investigation.   Nor could he, given that the evidence clearly shows that the investigation began after Kamakea self-reported Torres' alleged statement to her.   There is no argument here that Kamakea was biased against Torres.   As a result, any potential bias that Hokoana and/or Dangtayan may have had toward Torres is irrelevant for purposes of showing a causal link between Torres' protected activity and Wiles' decision to terminate him. *See Poland*, 494 F.3d at 1182; *see also Lakeside-Scott v. Multnomah Cty.*, 556 F.3d 797, 804 (9th Cir. 2009) (explaining that a "critical" question for purposes of causation is "whether a final decision maker's independent investigation and termination decision, *responding to a biased subordinate's initial report of*

---

[24]In *Poland*, the Ninth Circuit held that:

> if a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

*Poland*, 494 F.3d at 1182.

*misconduct*, can negate any causal link between the subordinate's retaliatory motive and an employee's termination") (emphasis added).

Finally, Torres argues that various other matters raise an inference of bias. Opp. at 20-21. All of these matters relate to Kamakea's allegations and what happened after she reported them. As just discussed, there is no argument that Kamakea was biased against Torres. As a result, none of the matters Torres relies upon are relevant to the causation analysis.[25]

Torres makes no further arguments as to why there is a causal link between his protected activity and his termination. Because the only argument that stands up is Wiles' knowledge of Torres' EEO complaint, Torres has failed to show a causal link

---

[25]Because Torres' characterizations of many of the matters are simply contradicted by the evidence or unsupported, the Court discusses some of them so that the record is clear. Torres asserts that Kawamoto appointed Hokoana and Dangtayan. The evidence shows, however, that Kawamoto did not make the appointment, Wiles did. In any event, as discussed above, there is no evidence that Kawamoto was biased against Torres. Torres also asserts that Wiles had previously dismissed allegations of sexual misconduct made by Schwenk. The evidence shows, however, that Wiles did not sustain a specification for removal against Torres based upon statements he purportedly made to Schwenk because the only witnesses to the statements were Schwenk and Torres. Torres additionally asserts that no other personnel were disciplined for "unprofessional conduct." Torres makes the same assertion in his concise statement of facts, but the evidence to which he cites does not support it. For example, Torres cites Okahara's deposition, but Okahara stated that he could not recall whether others had been disciplined, not that others had not been. 7/25/18 Deposition of Calvin Okahara at 61:17-62:1, Dkt. No. 54-9. Torres also cites Correa's deposition, but provides no page citation. Finally, Torres asserts that Kamakea's complaint of sexual harassment was "reduced" to a charge of unprofessional conduct. It is unclear how this is relevant to any issue. In any event, the fact that Kamakea accused Torres of sexual harassment, but TSA charged him with unprofessional conduct, at most, only shows that *Kamakea's accusation* was "reduced."

for purposes of his prima facie case.[26]   As a result, Defendants are entitled to

summary judgment on this ground.   *See Ray*, 217 F.3d at 1240.

Although it is unnecessary to continue with the burden-shifting framework,

the Court chooses to do so.

## B.    TSA's Legitimate, Non-Discriminatory Reasons

Defendants assert that TSA had legitimate, non-discriminatory reasons for

terminating Torres.   Renewed Mot. for Dismissal & Summ. Judg. at 25.

Specifically, Defendants assert that Torres failed to refrain from misconduct for a

period of 12 months, thus violating the LCA.   Defendants point to Torres'

purported unprofessional conduct and failure to provide truthful information as

violative of the LCA.

As discussed earlier, Torres makes no argument that Defendants have not set

forth a legitimate, non-discriminatory reason for his termination.   Instead, it

---

[26]The Court notes that, in the renewed motion, Defendants assert that the legal standard for causation in a Title VII retaliation case is "but-for causation."   Renewed Mot. for Dismissal & Summ. Judg. at 22.   Contrary to Torres' argument in opposition, Defendants are undoubtedly correct.   *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (concluding that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").   What Defendants fail to do, though, is provide any meaningful explanation of how the but-for causation standard affects the analysis of Torres' prima facie case.   *See Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250-251 & n.10 (4th Cir. 2015) (noting a circuit split "as to whether *Nassar* has any bearing on the causation prong of the prima facie case.").   Whether the Ninth Circuit has provided guidance on this split is unclear.   *But cf. T.B. ex rel Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015) (stating that *Nassar* held "the standard for the 'causal link' is but-for causation, a more stringent test.").   In any event, here, the Court finds that Torres has not established a causal link under any standard of causality.   Thus, to the extent *Nassar* affects the prima facie case, that effect only buttresses the Court's finding in this regard.

appears that Torres concedes this part of the burden-shifting framework.   *See* Opp.

at 31.   As a result, the Court will not walk down a path that Torres has foregone, and

finds that Defendants have set forth a legitimate, non-discriminatory reason for

Torres' termination: Torres' violations of the LCA.

## C.   Pretext

To show pretext, Torres "may do so either directly by persuading the court

that a retaliatory motive more likely motivated the employer or indirectly by

showing that the employer's proffered explanation is unworthy of credence."

*Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1022 (9th Cir. 2018) (quotation

and alteration omitted).

In his Opposition, Torres does not explain whether he is proceeding with the

direct approach, indirect approach, or both.   Nevertheless, he points to the

following reasons why a "retaliatory motive[]" can be inferred in this case.   *See*

Opp. at 32-33.   First, Torres asserts the "temporal proximity" of four investigations

occurring within a six-month period.   It appears that Torres believes these

investigations were temporally proximate to his participation in Koizumi's EEO

complaint in September 2009.   Torres, however, identifies only one of the

investigations: the investigation of Schwenk and Lungo's allegations.   There is no

argument that Schwenk and Lungo retaliated against Torres for participating in

Koizumi's complaint.   Thus, it is unclear how the investigation they initiated by

making allegations against Torres could be retaliatory. Torres appears to argue that the investigation was retaliatory because a "TSA Management Directive" requires reporting alleged sexual harassment as soon as it occurs. *See* Opp. at 5. Torres goes onto assert that Schwenk and Lungo's allegations were "stale" because they did not report them in a timely manner. It is hard to take this argument at face value because it appears to suggest that Schwenk, the person who was allegedly sexually harassed, should have reported the harassment as soon as she was harassed. Torres even suggests that Schwenk should have been "punish[ed]" for failing to do so. *See id*. The Court rejects any such suggestion. In any event, even if a less unreasonable construction could be made of Torres' argument, he has still failed to explain how investigating purportedly "stale" allegations of his misconduct suggests Wiles—who was not working at Kona Airport at the time—had a retaliatory motive in terminating Torres.

As for the other three investigations, combing Torres' Opposition and concise statement of facts in an attempt to find them, he mentions other incidents that may have involved investigations. These include a "be-on-the-lookout" order issued against him, sitting at a desk for 45 days with no duties, and what he contends was a "second" or "re-opened" investigation of Schwenk and Lungo's allegations. *See* Opp. at 12. As for the latter, the evidence does not support Torres' contention that the Schwenk/Lungo investigation was "re-opened." Instead, the evidence shows

that, with respect to Schwenk and Lungo's allegations, Chong Tim submitted a report to Correa on December 18, 2009, the report was under legal review at the time Correa left the TSA on January 2, 2010, and, after TSA's counsel reviewed the Chong Tim report, Okahara and Chong Tim transmitted further written questions to various witnesses over the next few months as a follow-up. Contrary to Torres' apparent belief, the fact that Chong Tim's report was under legal review does not mean the investigation was closed. The evidence to which Torres cites does not suggest otherwise.[27] As for the "be-on-the-lookout" order and 45 days of sitting at a desk, Torres asserts that they "clearly reflect" Kawamoto and Okahara's retaliatory intent. Opp. at 12. As discussed above, there is no evidence that Kawamoto had any motive to retaliate against Torres. Further, there is no evidence that these incidents suggest a retaliatory motive on Wiles' part in terminating Torres, especially given that both of the incidents occurred prior to his arrival at Kona Airport.

Second, Torres asserts that Hokoana and Dangtayan were appointed to investigate the Kamakea allegations, and, third, Torres asserts Hokoana and Dangtayan committed numerous violations in the investigation. The Court has previously addressed these matters. The same is true of other reasons Torres

---

[27]Torres cites his own deposition testimony, but he does not have personal knowledge of whether TSA closed the investigation. Torres also cites "Ex. K" and "Ex. O." Plaintiff's Concise Statement of Facts at 3, Dkt. No. 54. Torres, though, provides no pinpoint cite for Ex. K, and, although he provides a pinpoint cite for Ex. O, the page he cites is not contained in that exhibit.

suggest infer retaliatory motive, including the purported change of Kamakea's allegation of sexual harassment to a charge of unprofessional conduct, no other employee being disciplined for unprofessional conduct, and "selective prosecution" of Torres. Suffice to say, they have no bearing on whether retaliation motivated Wiles' decision to terminate Torres and/or are not supported by the evidence to which Torres cites.

Next, Torres asserts that there were "indications" of his removal before he could respond to the Kamakea allegations. To the extent Torres is referring to Wiles purportedly telling another individual that he had terminated Torres, as noted earlier, the evidence to which Torres cites indicates this occurred *prior* to the LCA. It, therefore, has no relevance as to Torres' ultimate termination, given that Torres was not terminated until at least ten months later, and then only after Wiles had agreed to the LCA.

Next, Torres asserts that he was removed from a "seniority list" prior to his termination. There is little mention of this purported event in much of the record. To the extent it occurred, it appears that it happened in May 2010, roughly 11 months prior to Torres' termination. In addition, it appears that, once the matter was brought to Wiles' attention, Wiles directed that Torres be reinstated to the list. As such, this is not evidence of a retaliatory motive on Wiles' part, and arguably suggests exactly the opposite. *See Candejas v. Johnson*, 71 F. App'x 639, 639 (9th

Cir. July 24, 2003) (affirming summary judgment for the defendant where disciplinary action was rescinded).[28]

Finally, at the end of Torres' concise statement of facts, in the only time it appears to be mentioned in his summary judgment papers, Torres asserts that Wiles had an "apparent conflict with the NTEU[] (union) represented by Mr. Torres." In other words, it appears that Torres is asserting that Wiles had a retaliatory motive against him due to Torres' union activities. As an initial matter, although the evidence to which Torres cites is not clear, it appears to suggest that Kamakea, not Wiles, may have had a union-based conflict with Torres. *See* 4/5/11 Response to the March 28, 2011 Proposed Reinstatement of Removal Action at 3, Dkt. No. 48-21.[29] More importantly, even if Torres' union assertion is true, that would not advance his retaliation claim because union activities are not protected under Title VII. *See Stucky v. Dep't of Educ.*, 283 F. App'x 503, 505 (9th Cir. June 20, 2008) (explaining that filing union grievances did not qualify as protected activities because there was no evidence showing the grievances were filed in opposition to Title VII violations).

---

[28]The same is true of the "be-on-the-lookout" order and Torres sitting at a desk for 45 days. Once these matters were investigated or brought to TSA's attention, they were rescinded or stopped.

[29]This would be consistent with the allegation in the Complaint that Kamakea had a union-based conflict. *See* Compl. ¶ 23. To repeat, though, Torres makes no argument here that Kamakea was biased against him. Moreover, as alleged in the Complaint, Kamakea's conflict related to an upcoming election—something which has nothing to do with Torres' protected activities under Title VII.

Ultimately, the evidence shows that Wiles spoke with both Torres and Kamakea about the pertinent incident. Wiles believed Kamakea's version of events. Whether Kamakea told the truth or made up her story is therefore irrelevant. *See Villiarimo*, 281 F.3d at 1063 (explaining that, whether a proferred reason for termination is false, is "not important," as an employer need only "honestly believe[]" its reason for acting). Here, there is no evidence that Wiles did not honestly believe Kamakea's version of events. In addition, there is no evidence (or even argument) that Wiles otherwise retaliated against Torres in some other fashion. As a result, for these reasons as well, Defendants are entitled to summary judgment on Torres' retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendants' Renewed Motion for Dismissal and Summary Judgment. Dkt. No. 47.

The Clerk is ORDERED to enter Judgment as to Count One of the Complaint in favor of Defendants, and then close this case.

IT IS SO ORDERED.

DATED: November 5, 2018 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

41